UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
UNITED STATES OF AMERICA,

                                              **MEMORANDUM AND ORDER**

       -against-                              12-CR-214(KAM)


ELVIN HILL

                        Defendant.
------------------------------------X

**MATSUMOTO, United States District Judge:**

          Pending before the court is defendant Elvin Hill's
("defendant" or "Mr. Hill") motion to suppress an in-person
lineup identification of the defendant on August 25, 1997, and
to preclude an eyewitness identification of the defendant in
court because (i) his rights under the Fourth and Fifth
Amendments of the United States Constitution allegedly were
violated, and (ii) because the lineup allegedly was unduly
suggestive.  Mr. Hill is charged with fatally shooting Fredy
Cuenca during the course of a robbery on June 29, 1997, in
violation of 18 U.S.C. § 924(j)(1).

       **I.    Background**

          On June 26, 2012, Mr. Hill filed motions requesting
(i) that the indictment be dismissed for undue delay for
violating his rights under the Due Process Clause of the Fifth
Amendment, (ii) additional disclosure pursuant to *Giglio v.
United States*, 405 U.S. 150 (1972), and *Brady v. Maryland*, 373

1

U.S. 83 (1963), (iii) the suppression of identification testimony pursuant to Federal Rule of Criminal Procedure 12(b)(3)(c), and (iv) other relief deemed proper by the court. (ECF No. 11, First Motion to Dismiss on Speedy Trial Delay in Prosecution, violating Due Process Clause of Fifth Amendment, First Motion to Suppress Identification Testimony, First Motion to Compel *Giglio* and *Brady* Material by Elvin Hill, 6/26/12.)  In the alternative, Mr. Hill sought a hearing before the court. (*Id.* at 17.)  The government filed a response on July 9, 2012. (ECF No. 13, Response in Opposition re: First Motion to Dismiss on Speedy Trial Delay in Prosecution, violating Due Process Clause of Fifth Amendment, First Motion to Suppress Identification Testimony, First Motion to Compel *Giglio* and *Brady* Material by Elvin Hill, 7/9/12.)  Mr. Hill filed a letter in lieu of a reply in support of his motion on July 19, 2012. (ECF No. 15, Reply to Response in Opposition re: First Motion to Dismiss on Speedy Trial Delay in Prosecution, violating Due Process Clause of Fifth Amendment, First Motion to Suppress Identification Testimony, First Motion to Compel *Giglio* and *Brady* Material by Elvin Hill, 7/19/12.)

The court held a hearing on the motions on July 26, 2012, during which the government presented one witness, Michael Zeller ("Zeller"), an investigator with the Unites States Attorney's Office for the Eastern District of New York and a

2

former detective with the New York City Police Department ("NYPD"). At the hearing, counsel for Mr. Hill stated that the motion to dismiss the indictment for undue delay had been withdrawn. (7/26/2012 Hearing Transcript ("7/26/12 Tr.") at 67.) The court was also informed during the hearing that the parties would work to resolve their discovery issues, and the court has not been advised of any additional discovery disputes. (*Id.* at 73-74.) The court reminds the government to be mindful of its *Brady* obligations and promptly turn over any *Brady* material to the defendant.

After the hearing, Mr. Hill submitted additional briefing on August 20, 2012, on his motion to preclude an in-court eyewitness identification and to suppress the lineup identification. (ECF No. 16, Memorandum in Support re: First Motion to Dismiss on Speedy Trial Delay in Prosecution, violating Due Process Clause of Fifth Amendment, First Motion to Suppress Identification Testimony, First Motion to Compel *Giglio* and *Brady* Material by Elvin Hill, 8/20/12.) The government submitted a letter in further opposition to the motion on September 7, 2012. (ECF No. 18, Letter in Response to Defendant's Post-hearing Brief as to Elvin Hill, 9/7/12.) Mr. Hill submitted a letter reply on September 21, 2012. (ECF No. 19, Letter Submitting Reply to Government's Response to

Defendant's Motion in Support of Suppression as to Elvin Hill, 9/21/12.)

On September 27, 2012, at the request of the defendant, the court ordered four witnesses to appear at a continued suppression hearing: Tonya Givens ("Givens"), the witness who identified Mr. Hill in the lineup on August 25, 1997; Gregory Millwater ("Millwater"), a retired NYPD detective; Daniel Carmosin ("Carmosin"), a retired NYPD detective; and Peter Meade ("Meade"), a retired NYPD detective sergeant.  The continued suppression hearing was held on November 6, 2012, and November 13, 2012.  Givens and Zeller testified on November 6; Zeller, Millwater, Carmosin, and Meade testified on November 13.

On January 2, 2013, the government submitted a post-hearing brief in opposition to the defendant's motion to suppress the in-person lineup identification of the defendant by Givens, as well as any in-court identification testimony by Givens.  (ECF No. 26, Post-Hearing Brief in Opposition to Defendant's Pending Motion to Suppress, 1/2/13.)  Mr. Hill responded by submitting a letter in lieu of a formal memorandum of law on January 3, 2013, to preclude any in-court identification by Givens and to suppress the lineup identification by Givens (i) because Mr. Hill allegedly was unlawfully detained and interrogated in violation of the Fourth and Fifth Amendments, and (ii) because the lineup allegedly was

unduly suggestive. (ECF No. 26, Defendant's Letter re: Motion to Suppress ("Def. Let."), 1/3/13.) The government filed a letter in opposition to Mr. Hill's motion on January 9, 2013. (ECF No. 27, Government's Letter in Response to Defendant's Letter re: Motion to Suppress ("Gov. Let."), 1/9/13.) On January 9, 2013, Mr. Hill submitted a letter stating that he was relying on his previous written submissions and did not intend to file a reply. (ECF No. 28, Reply to Government's Letter in Response to Defendant's Letter re: Motion to Suppress, 1/9/13.) On January 22, 2013, the court cancelled oral argument based on the parties' representations that they wished to rely on their written submissions and considered the motion fully briefed. Upon consideration of the written submissions, the testimony, and other evidence, the court denies defendant's motion to suppress for the reasons stated below.

## Factual Findings

### A. Credibility of the Witnesses

Zeller, whose testimony the court finds credible, worked for 20 years with the NYPD and retired as a detective in 2005; he has been employed since 2005 as an investigator with the U.S. Attorney's Office for the Eastern District of New York. (7/26/12 Tr. at 7-8.) Millwater, whose testimony the court finds credible, worked for the NYPD from 1985 to 2007, retiring as a detective. (11/13/2012 Hearing Transcript ("11/13/12 Tr.")

at 29.)  Carmosin, whose testimony the court finds credible, worked for the NYPD from 1978 to 2002, retiring as a detective. (*Id.* at 21.)  Meade, whose testimony the court finds credible, worked for the NYPD from 1980 to 2005, retiring as a detective sergeant.  (*Id.* at 4.)  Givens, whose testimony the court finds credible, resided in Brooklyn, New York, in 1997.  (11/6/12 Hearing Transcript ("11/6/12 Tr.") at 86.)

### B.    Investigation, Detention, and Arrest of Mr. Hill

Zeller was the primary detective assigned to investigate the homicide of Fredy Cuenca, a livery cab driver who was shot and killed in Brooklyn on June 29, 1997.  (7/26/12 Tr. at 8; Government Exhibit ("Gov. Ex.") 3500-TG-2.)  Two days after the shooting, on July 1, 1997, Zeller spoke to Givens, (7/26/12 Tr. at 10-11), who had been standing on a stoop outside her residence with a friend when Cuenca's cab pulled up about two houses away on June 29.  (11/6/12 Tr. at 86.)  Givens testified that she heard a muffled boom, saw the driver's side window blow out, and then saw two young men jump out of the vehicle and run away.  (*Id.*)  Zeller testified that Givens told him that one of the men she had seen getting out of Cuenca's cab was a black male about 16 to 18 years old with a slim build and chocolate-colored skin who wore a red t-shirt and long, dark jean shorts that fell below his knees.  (7/26/12 Tr. at 10-11, 26-27.)  Zeller also testified that Givens told him that this

6

man had exited the rear passenger door of the cab with a gun in his hand. (*Id.* at 26.) According to Zeller, the physical description of the suspect provided by Givens matched the descriptions of the suspect provided by witnesses Jose Dutan, George Jiminez, and Nancy Holston. (11/6/12 Tr. at 149.)

Zeller further testified that he received additional information about the homicide from a confidential informant ("CI") on July 8, 1997. (11/13/12 Tr. at 105-06; Gov. Ex. 3500-MZ-20.) Although Zeller had not previously worked with this CI, another officer from the same precinct had worked with the CI. (11/6/12 Tr. at 136.) Zeller testified that the NYPD paid the CI several hundred dollars in connection with the investigation. (*Id.*)

The CI told Zeller that one suspect was a black male with brown-colored skin who went by the name "Elton," was between 19 and 21 years old, about 5'7" to 5'8" tall, weighed 150 to 160 pounds, and was out on parole. (11/13/12 Tr. at 105.) The CI also told Zeller that he knew Elton "from the neighborhood," that he had spoken to Elton shortly after the shooting, and that Elton had told him that he shot a cab driver in the head "to become a full [member of the] Blood[s]" gang. (11/6/12 Tr. at 136-37.) Zeller also testified that the CI said that he had seen Elton and another individual running after the shooting. (11/13/12 Tr. at 106.)

The CI called on July 15, 1997, to tell Zeller that he
had taken photographs of the individual he had identified as
Elton. (*Id.* at 77.) Another detective picked up the photographs
from the CI and later provided the photos to Zeller. (*Id.* at
77-78.) Zeller testified that several weeks later, on August
10, 1997, the CI spoke to him again and told him that Elton, who
the CI now said also went by the name Elvin, had recently shot
another person on August 9, 1997. (*Id.* at 82-84.)

An anonymous woman called Zeller on August 14, 1997,
to report that the man responsible for the August 9 shooting was
in front of 588 Wilson Avenue. (*Id.* at 84; 11/6/12 Tr. at 150-
51.) Zeller testified that he went to the address and
encountered the defendant, who said his name was "Messiah
Johnson." (11/6/12 Tr. at 151.) Because the defendant did not
have any identification, Zeller asked him to come to the
precinct. (*Id.*)[1] According to a contemporaneous police report,
after arriving at the precinct with the defendant, Zeller first
queried the NYPD computer system for the name provided by the
defendant, "MESIAH JOHNSON [sic]," but did not obtain any
results. (Gov. Ex. 3500-MZ-17.) Then, Zeller asked Mr. Hill if
he had ever been arrested, and Mr. Hill responded that he had
been arrested by an Officer Riddle. (Gov. Ex. 3500-MZ-17;

---

[1] Mr. Hill was handcuffed before he was transported to the police station, but
Zeller's contemporaneous report states that Mr. Hill requested to be
handcuffed because he did not want residents in the area to see him enter
Zeller's car without being handcuffed. (Gov. Ex. 3500-MZ-17.)

11/6/12 Tr. at 153.)  Zeller photographed the defendant at the
precinct with the defendant's consent.  (Gov. Ex. 3500-MZ-17.)
Zeller credibly testified that he did not ask the defendant
about either the Cuenca homicide or the August 9, 1997 shooting
and did not read him a *Miranda* warning.  (11/13/12 Tr. at 88-
89.)  The defendant was in custody for 50 minutes and was not
charged with any crime during his detention.  (Gov. Ex. 3500-MZ-
12.)

Zeller showed the photograph he had taken of the
defendant to Officer Riddle the next day, August 15, 1997.
(11/6/12 Tr. at 153-54; Gov. Ex. 3500-MZ-10.)  Zeller testified
that Officer Riddle told him the defendant's name was Elvin Hill
and provided him with arrest paperwork, which included a New
York State Identification number ("NYSID").  (11/13/12 Tr. at
90-91.)  Zeller testified that he inputted the NYSID in the
NYPD's computer system and identified the parole officer
associated with the defendant's NYSID.  (*Id.* at 91-92.)  Zeller
testified that he then contacted the defendant's parole officer
and learned there was an active arrest warrant for Mr. Hill, who
was listed in the system as "Jack Henry."  (*Id.* at 93-94.)
Zeller testified that the government's arrest warrant listed the
names "Jack Henry" and "Alvin Hill."  (*Id.* at 98.)

Zeller arrested Mr. Hill on August 25, 1997 pursuant
to the warrant for a parole violation.  (11/6/12 Tr. at 154-56.)

### C. The Lineup

Mr. Hill was brought to the precinct after his arrest at 6:45 p.m. on August 25, 1997. (7/26/12 Tr. at 38.) Givens arrived at the precinct at 8:40 p.m., transported by detectives Millwater and Carmosin. (*Id.* at 39, 44.) Givens testified that the detectives had picked her up at her home and told her that she was going to view a lineup, but had not provided her with any more information about the lineup. (11/6/12 Tr. at 88.)

Givens testified that she waited at the precinct for about 30 minutes before viewing the lineup. (*Id.* at 89.) She testified that she did not have any conversations with police officers or other witnesses. (*Id.*) Givens also testified that she viewed the lineup through a one-way window from a room with other police officers who told her that while she could see the individuals in the lineup, those in the lineup could not see her. (*Id.* at 89-90.) Givens testified that the officers told her to "just pick out the guy that [she] saw that day." (*Id.* at 90.) Givens testified that she understood their instructions to mean that she should indicate whether she recognized one of the suspects from the June 29, 1997 homicide, but she did not assume that one of the men she had seen leaving Cuenca's cab would necessarily be present in the lineup. (*Id.* at 91-92, 119-20.)

At the time of the lineup, Mr. Hill was 18 years old, 5'9" tall, and weighed 150 pounds. (7/26/12 Tr. at 13.) The

other five men in the lineup were also black men and were between 5'6" and 6' tall, weighed between 150 and 200 pounds, and were between 20 and 23 years of age.[2] (*Id.*) All of the lineup subjects were seated. (*Id.*) Two of the subjects wore white shirts, four wore dark blue or black shirts, and at least three wore shorts. (*Id.* at 14-15.)

Givens testified that she watched through the window in the lineup room as the lineup subjects entered and sat down. (11/6/12 Tr. at 125-26.) Carmosin testified that, while he did not remember this specific lineup, it was standard procedure to ensure that all of the lineup subjects were seated before allowing a witness to view the lineup to eliminate any suggestiveness that could occur as lineup subjects walked into a room. (11/13/12 Tr. at 28.) While seated, each lineup subject held up a card with a number indicating his position in the lineup. (Gov. Ex. 3500-MZ-3.)

Zeller and Meade were with Givens in the viewing room when she looked at the lineup through a one-way mirror. (7/26/12 Tr. at 15-16.) Zeller testified that when he asked Givens if she recognized anyone, she replied: "Yes, number two,

---

[2] Mr. Hill was in position two. The man in position one of the lineup was 23 years old, 5'9" tall, and weighed 200 pounds. The man in position three was 21 years old, 5'11" tall, and weighed 175 pounds. The man in position four was 20 years old, 5'8" tall, and weighed 170 pounds. The man in position five was 23 years old, 5'6" tall, and weighed 150 pounds. The man in position six was 20 years old, 6' tall, and weighed 200 pounds. (7/26/12 Tr. at 13.)

his face." (*Id.* at 17.) Zeller testified that when he asked Givens where she recognized the man from, she answered "[t]hat day, that Sunday with the cabby." (*Id.*) Zeller testified that when he asked Givens what the man did, she replied: "[h]e got out of the cab with the gun in the air." (*Id.*)

Givens testified that she told the officers that she was 70% sure of her identification. (11/6/12 Tr. at 130.) But Zeller testified that Givens did not provide such a percentage and that he would have memorialized it in his notes if she had. (*Id.* at 157-59.) Givens also testified that she remembered identifying the individual who exited the cab from the driver's side, and that this individual did not have a weapon. (*Id.* at 120-21.)

## DISCUSSION

First, Mr. Hill argues that the court should suppress the lineup identification on August 25, 1997, and preclude an in-court identification because he was (i) arrested on August 14, 1997, without a warrant or probable cause, in violation of his Fourth Amendment rights, (ii) was questioned while under arrest without receiving a *Miranda* warning, a violation of his Fifth Amendment rights, and therefore (iii) was not in lawful police custody on the outstanding parole violation warrant on August 25, 1997, because he was arrested as a result of information that was unconstitutionally obtained on August 14,

1997.  (*Id.* at 13.)  Mr. Hill also argues that the government did not independently have probable cause to compel him to appear in the lineup based on information provided by the CI. (*Id.* at 13-14.)

In addition, Mr. Hill argues that the lineup was unduly suggestive because (i) Givens could not definitively state that she had not seen any of the subjects in the lineup before viewing the lineup, (ii) Givens testified that she saw the subjects of the lineup walk into the room and sit down, (iii) Givens was not given instructions tailored to reduce suggestiveness and mistaken identification, (iv) the lineup was simultaneous instead of sequential, (v) there were disparities in the physical appearances between Mr. Hill and three of the fillers in the lineup, and (vi) there were discrepancies between Zeller's testimony and Givens's testimony concerning the lineup. (*Id.* at 14-17.)

### A. General Principles

### i.  Investigative Detention

An investigative detention is permissible under the Fourth Amendment if police have "'reasonable suspicion' to believe that criminal activity has occurred or is about to occur." *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995) (citing *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir.

1992)); *see also United States v. McCargo*, 464 F.3d 192, 197 (2d Cir. 2006) (stating that an officer need only have "reasonable suspicion" of criminal activity to stop and temporarily detain a suspect) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

"Reasonable suspicion is an objective standard . . . the subjective intentions or motives of the officer making the stop are irrelevant." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (internal citation omitted); *see also Glover*, 957 F.2d at 1010 (stating that whether an officer had reasonable suspicion to make a stop is determined under an objective standard). Although the concept of reasonable suspicion has not been precisely defined, "the requisite level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *Glover*, 957 F.2d at 1009 (internal quotation and citation omitted); *see also United States v. Lawes*, 292 F.3d 123, 127 (2d Cir. 2002) (same).

Still, "the Fourth Amendment requires 'some minimal level of objective justification' for making the stop." *Glover*, 957 F.2d at 1009-1010 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *Bayless*, 201 F.3d at 133 (same). An officer "must be able to articulate the specific and objective facts that form the basis for that reasonable suspicion." *United States v. Gomez*, 633 F.2d 999, 1004 (2d Cir. 1980); *see also United States v. Reyes*, 821 F.2d 168, 170-71 (2d Cir. 1987)

(holding that a customs inspector had shown reasonable suspicion
to detain defendants because he could articulate "specific and
objective facts" about their conduct).

Finally, the scope and duration of an investigative
detention must be reasonable. *See Tehrani*, 49 F.3d at 58. "The
investigation must be as minimally intrusive as possible,
bearing in mind the circumstances that gave rise to the
suspicion." *Id.* Moreover, the "investigative detention must be
temporary and last no longer than is necessary to effectuate the
purpose of the stop . . . [and] the investigative methods
employed should be the least intrusive means reasonably
available to verify or dispel the officer's suspicion in a short
period of time." *United States v. Brockington*, 378 F. App'x 90,
92 (2d Cir. 2010); *Tehrani*, 49 F.3d at 58 (same, and noting that
the availability of alternative forms of detention, "[t]he
length, . . . and conditions . . . of the detention inform this
determination"). If an investigative stop or detention "based
on reasonable suspicion continues too long or becomes
unreasonably intrusive, it will ripen into a *de facto* arrest
that must be based on probable cause." *Glover*, 957 F.2d at
1011.

### ii.  Questioning in Custody

Under *Miranda v. Arizona*, the Fifth Amendment
protection against self-incrimination requires that "any

information elicited by the police as the result of custodial interrogation of a suspect may not be introduced into evidence against him unless he has just been advised of and has waived certain basic constitutional rights." *United States ex rel. Hines v. LaVallee*, 521 F.2d 1109, 1112 (2d Cir. 1975); *see Miranda v. Arizona*, 384 U.S. 436, 467-69 (1966).

Not all questioning in custody, however, must be conducted pursuant to a *Miranda* warning. The Supreme Court has clarified that an interrogation includes "express questioning" and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). It is generally proper for police to question a suspect about basic biographical information to ascertain the suspect's identity in the absence of a *Miranda* warning because such questions are unlikely to elicit incriminating information and thus "do not pose the dangers *Miranda* was designed to check." *United States v. Carmona*, 873 F.2d 569, 573 (2d Cir. 1989) (internal quotation and citation omitted); *see also Pennsylvania v. Muniz*, 496 U.S. 582, 601-602 (1990) (plurality opinion) (questions about suspect's name, address, and other data necessary to establish identity were permissible without *Miranda* warning because they were used to obtain "biographical

data necessary to complete booking or pretrial services")
(internal quotation and citation omitted); *United States v.
Rommy*, 506 F.3d 108, 131-32 (2d Cir. 2007) (noting that a
*Miranda* warning is necessary only in the context of custodial
interrogation as explained by *Innis*).  Therefore, "investigative
interrogation intended to elicit information about crimes and
the suspect's possible involvement in them" requires a *Miranda*
warning, but questions about "basic information needed to
facilitate the booking and arraigning of a suspect" can
generally take place without a *Miranda* warning.  *Carmona*, 873
F.2d 569, 573.

The Second Circuit has consistently held that
"pedigree questions," or "[r]outine questions about a suspect's
identity . . . ordinarily innocent of any investigative purpose,
do not pose the dangers *Miranda* was designed to check; they are
rather the sort of questions 'normally attendant to arrest and
custody.'"  *United States v. Gotchis,* 803 F.2d 74, 79 (2d Cir.
1986) (quoting *Innis*, 446 U.S. at 301); *see also United States
v. Rodriguez*, 356 F.3d 254, 259 n.2 (2d Cir. 2004) ("pedigree
information solicited through routine questioning of arrested
persons . . . does not implicate the protections of *Miranda*");
*Carmona*, 873 F.2d at 573 ("obtaining such pedigree information
has not been viewed as unlawful custodial interrogation");
*United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir. 1988)

17

("the solicitation of information concerning a person's identity and background does not amount to custodial interrogation"). Pedigree questions can include questions about a suspect's name, address, employment history, date of birth, *see Gotchis*, 803 F.2d at 78-79, nicknames, *see Adegbite*, 846 F.2d at 838, and other basic identification-related information, *see LaVallee*, 521 F.2d at 1113.

Determining whether police "abused the gathering of pedigree information in a manner that compels *Miranda* protection requires an objective inquiry: Should the police have known that asking the pedigree questions would elicit incriminating information?" *Rosa v. McCray*, 396 F.3d 210, 222 (2d Cir. 2005) (citing *Innis*, 446 U.S. at 308). An incriminatory response is considered "any response -- whether inculpatory or exculpatory -- that the *prosecution* may seek to introduce at trial." *Innis*, 446 U.S. at 301 n.5 (emphasis in original). In addition, because the purpose of the *Miranda* rule is to prevent compulsion, "the relevant inquiry in deciding whether words or actions constitute interrogation focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Rommy*, 506 F.3d at 132 (internal quotation omitted).

### iii. Placement in Lineup

The Second Circuit has not addressed the question of whether a lawfully detained person can be compelled to appear in

a lineup concerning an unrelated charge, but other circuits that have considered the issue have held that such compulsion is permissible. *See Rigney v. Hendrick*, 355 F.2d 710, 713, 714-15 (3d Cir. 1965) (compelling a suspect in custody to appear in a lineup for other charges "was proper and reasonable and does not infringe upon any constitutional rights" because he was "already in custody"); *see also United States v. Anderson*, 490 F.2d 785, 788-89 (D.C. Cir. 1974); *United States v. Anderson*, 406 F.2d 719, 720 (4th Cir. 1969). In addition, one district court in the Second Circuit has held that "a person in lawful custody may be placed in a lineup for unrelated crimes of which he is a suspect, and such a procedure is consistent with due process." *Collins v. Scully*, 878 F. Supp. 452, 456 (E.D.N.Y. 1995). Another district noted that "other circuits have found no violation of constitutional rights when a defendant held on unrelated charges was compelled to appear in a lineup to be viewed by victims of separate offenses" in holding that a suspect who was already in custody on unrelated charges "need not formally be accused of [a] crime before being placed in a lineup." *Aziz v. Warden of Clinton Corr. Facility*, No. 89 Civ. 6053, 1991 WL 278907, at *6 (S.D.N.Y. Dec. 18, 1991).

An arresting officer has probable cause under the Fourth Amendment if he has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution

in the belief that an offense has been committed by the person to be arrested." *See, e.g.*, *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (quoting *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)). A finding of probable cause is made based on the "totality of the circumstances." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (citing *Illinois v. Gates*, 462 U.S. 213, 230 (1982).

Therefore, to determine whether information provided by a confidential informant is sufficient to support probable cause, courts examine the "informant's veracity and . . . the quality of his sources of knowledge of the information." *United States v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993). Information provided by "a confidential informant, who had proved reliable in the past, which information was corroborated in part by surveillance observations, [can be] sufficient to establish probable cause." *United States v. Rijo*, 502 F. App'x 103, 105 (2d Cir. 2012). In addition, in evaluating a confidential informant's veracity, a court can consider factors such as (i) whether the information was provided on the phone or in a face-to-face interaction, and (ii) whether certain aspects of the informant's declaration have been verified by other sources. *See United States v. Canfield*, 212 F.3d 713, 719-720 (2d Cir. 2000); *Wagner*, 989 F.2d at 73 ("Even where an informant has no proven record, if an informant's declaration is corroborated in

material respects, the entire account may be credited, including parts without corroboration.").

### iv. Lineup Procedures

In deciding a motion to suppress identification testimony, the relevant question is whether the identification procedures were "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *United States v. Jakobetz*, 955 F.2d 786, 803 (2d Cir. 1992) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)); *Jarrett v. Headley*, 802 F.2d 34, 40-41 (2d Cir. 1986) (same).

Due process does not require that the fillers in a lineup be nearly identical to a defendant. *See, e.g.*, *Clark v. Kuhlmann*, 123 F. App'x 24, 26 (2d Cir. 2005); *Collins*, 878 F. Supp. at 456 (same). But "[w]hen the appearance of participants in a lineup is not uniform . . . the principal question in determining suggestiveness is whether the appearance of the accused, *matching descriptions given by the witness*, so stood out from all of the others . . . as to suggest to an identifying witness that [that person] was more likely to be the culprit." *United States v. Wong*, 40 F.3d 1347, 1359-1360 (2d Cir. 1994) (emphasis and alterations in original) (internal quotation and citation omitted); *Abdur Raheem v. Kelly*, 257 F.3d 122, 134 (2d Cir. 2001) ("A lineup is unduly suggestive as to a given

defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not."); *cf. Solomon v. Smith*, 645 F.2d 1179, 1182-84 (2d Cir. 1981) (lineup unduly suggestive where victim was shown isolated picture of suspect "many times" before lineup, was allowed to stand one person away from suspect for 20-30 minutes at arraignment, and where all of the other lineup participants were significantly larger than suspect). In addition, lineups in which the suspect is the only participant "wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing the dangers of misidentification." *Abdur Raheem*, 257 F.3d at 134.

### B. Analysis

### i. Investigative Detention on August 14, 1997

The first issue before the court is whether Mr. Hill's Fourth Amendment rights were violated because he was taken into custody on August 14, 1997 without a warrant. Mr. Hill argues that he was arrested that day "without a warrant, probable cause, or any other lawful authority." (Def. Let. at 12.) Mr. Hill also argues that (i) information from the CI that someone named Elvin was responsible for the Cuenca homicide and a second fatal shooting, and (ii) an anonymous phone call stating that the man responsible for the second shooting was at a specific

location were insufficient to show the probable cause necessary for an arrest on August 14, 1997. (*Id.*)

The duration and scope of Mr. Hill's detention on August 14, 1997 show that he was subjected to an investigative detention that did not ripen into an arrest. Mr. Hill was in custody for only 50 minutes. (Gov. Ex. 3500-MZ-12.) The amount of time Mr. Hill spent in custody is comparable with the amount of time that suspects in other cases spent in investigative detentions that courts held were not arrests. *See, e.g.*, *Tehrani*, 49 F.3d at 61 (collecting cases where investigative detentions of between 20 and 45 minutes in duration were approved by courts). Moreover, the length of Mr. Hill's time in custody was reasonable for the limited questioning necessary to ascertain Mr. Hill's identity. Although Zeller had received information that Mr. Hill may have been responsible for a shooting, the questions regarding Mr. Hill's background and identity did not seek information about the shooting or Mr. Hill's possible involvement. *See Glover*, 957 F.2d at 1012-1013 (finding detention of defendant to determine his identity and whether he was involved in narcotics trafficking was permissible because its duration was limited to time necessary to conduct brief questioning and await arrival of a narcotics dog).

The scope of the police investigation during Mr. Hill's detention on August 14, 1997, was also reasonable because

it was limited to brief questioning concerning Mr. Hill's identity. First, Zeller's contemporaneous report of the incident, which the court finds reliable, states that he asked Mr. Hill to come with him to the precinct and that Mr. Hill accompanied him without incident. (Gov. Ex. 3500-MZ-17.) Second, Zeller's questioning of Mr. Hill at the precinct was limited to Mr. Hill's alleged name "Messiah Johnson" and arrest history. (11/6/12 Tr. at 151-53.) Third, Zeller took a single consensual photograph of Mr. Hill as a way to continue the investigation into whether Mr. Hill's name was actually "Messiah Johnson." (11/6/12 Tr. at 151-52; Gov. Ex. 3500-MZ-17.) Thus, a review of the investigative methods employed – a brief discussion limited to basic biographical data and a voluntary photograph – shows that Zeller employed investigative methods that were "the least intrusive means reasonably available" to verify the defendant's identity. *Brockington*, 378 F. App'x at 92.

In addition, Zeller had reasonable suspicion to detain Mr. Hill on August 14, 1997 because Zeller had received photographs and detailed information from the CI about the defendant that matched information provided by other witnesses. By August 14, the CI, who had previously worked with another officer in the department, (11/6/12 Tr. at 136), had (i) provided Zeller with a physical description of the suspect in

24

the Cuenca shooting, (11/13/12 Tr. at 105), (ii) given Zeller
photographs of the suspect, (11/6/12 Tr. at 137-39), (iii)
informed Zeller that the suspect was also responsible for an
August 9, 1997 shooting, (11/13/12 Tr. at 82-83), and (iv) told
Zeller that the suspect went by the name "Elvin," (*id.* at 84).

The physical description of the suspect provided by
the CI generally matched the physical descriptions of the
suspect provided by witnesses Givens, Dutan, Jiminez, and
Holston. (11/6/12 Tr. at 149.) When Zeller arrived in the area
specified by the anonymous caller on August 14, he quickly
recognized the defendant, who was the same figure in the
photographs provided by the CI, (11/6/12 Tr. at 138-39), and
also matched the description provided by the anonymous caller,
(Gov. Ex. 3500-MZ-17). Finally, Mr. Hill exhibited strange
conduct when Zeller spoke to him. The defendant gave Zeller an
unusual name, "Messiah Johnson," and claimed he did not have any
identification. (11/6/12 Tr. at 151.)

### ii. Questioning in Custody on August 14, 1997

The second issue before the court is whether the
defendant's Fifth Amendment rights were violated because he was
questioned in custody on August 14, 1997, without being given a
*Miranda* warning. Mr. Hill argues that he was subjected to a
custodial interrogation without a *Miranda* warning, a violation
of his Fifth Amendment rights, because Zeller's questioning

"went beyond mere pedigree, specifically inquiring as to the defendant's prior criminal history." (Def. Let. at 12.)

Questions concerning basic biographical information are generally considered pedigree questions because they are necessary to verify the identity of an individual in custody. *See Adegbite*, 846 F.2d at 838; *see also Muniz*, 496 U.S. at 601-602 (plurality opinion); *Gotchis*, 803 F.2d at 78-79. In this case, the record shows that Zeller asked the defendant whether he had been arrested while trying to verify whether the defendant's name was actually "Messiah Johnson." (11/13/12 Tr. at 151-53.)

According to a contemporaneous police report, Zeller first queried the NYPD computer system for the name "MESIAH JOHNSON [sic]" while Mr. Hill was in custody but did not obtain any results. (Gov. Ex. 3500-MZ-17.) Then, Zeller asked Mr. Hill if he had ever been arrested, and Mr. Hill responded that he had been arrested by Officer Riddle.[3] (*Id.*) Thus, because Zeller asked Mr. Hill about previous arrests in the course of trying to verify his identity, the court finds that Zeller's question about previous arrests was a pedigree question intended to verify biographical information provided by Mr. Hill that Zeller had reason to suspect was incorrect. *See McCray*, 396

---

[3] Zeller also credibly testified that he did not ask Mr. Hill any questions about either the Cuenca homicide or the unrelated August 9, 1997 shooting. (11/13/12 Tr. at 88-89.)

F.3d at 222 (stating that "if the officer perceives – either through direct observation or otherwise – that a specific piece of information provided by the arrestee is patently incorrect, then it is not only reasonable, but arguably the officer's duty, to inquire further"); *Adegbite*, 846 F.2d at 838 (stating that "the solicitation of information concerning a person's identity and background does not amount to custodial interrogation" in holding that defendant could be asked about a nickname); *LaVallee*, 521 F.2d at 1112-1113 (noting that the purpose of a *Miranda* warning is to "protect[] the suspect against interrogation of an investigative nature rather than the obtaining of basic identifying data" such as questions about a suspect's name, address, or marital status).

It should be noted that Mr. Hill's statement that he had previously been arrested by Officer Riddle provided Zeller with a missing link that ultimately connected Mr. Hill to the Cuenca homicide. Zeller had received information from the CI that the suspect responsible for the Cuenca homicide (i) was on parole, (11/13/12 Tr. at 105), (ii) went by the name "Elvin," (*id.* at 84), and (iii) was also responsible for the August 9, 1997 shooting, (*id.* at 83). When Zeller showed the photograph of Mr. Hill to Officer Riddle, Officer Riddle told him that the defendant's name was Elvin Hill and provided him with an arrest report. (11/6/12 Tr. at 153-54.) Zeller used the information

provided by Officer Riddle to determine that there was an outstanding warrant for Mr. Hill's arrest for a parole violation.  (11/13/12 Tr. at 93-95.)  Zeller then arrested Mr. Hill pursuant to that warrant.  (*Id.* at 96.)

To evaluate whether the pedigree question about previous arrests was employed in a way that compels *Miranda* protection, however, this court must engage in an *objective* inquiry and determine whether Zeller should have known that asking Mr. Hill if he had been arrested was reasonably likely to elicit an incriminatory response.  *McCray*, 396 F.3d at 222 (citing *Innis*, 446 U.S. at 308).  The Supreme Court has defined an incriminatory response as "any response -- whether inculpatory or exculpatory -- that the *prosecution* may seek to introduce at trial."  *Innis*, 446 U.S. at 301 n.5 (emphasis in original).  Although the subjective intent of Zeller in asking the pedigree question is relevant, the analysis is largely an objective one, *see McCray*, 396 F.3d at 222, and the primary focus is on the perceptions of the suspect, *see Rommy*, 506 F.3d at 132.

The record shows that Zeller could not have known that asking Mr. Hill if he had previously been arrested was reasonably likely to elicit an incriminating response.  Zeller asked Mr. Hill if he had been arrested during a questioning session that focused on trying to ascertain Mr. Hill's identity,

after Mr. Hill stated that his name was "Messiah Johnson."
(11/6/12 Tr. at 151-53; Gov. Ex. 3500-MZ-17.)  Zeller would have
reasonably expected Mr. Hill to reply with a "yes" or "no"
response to the question about previous arrests, information
that would then be used to verify whether Mr. Hill had provided
an accurate name.  *See Gotchis*, 803 F.2d at 79 (question about
defendant's employment status without *Miranda* warning
permissible because an answer to that question would in *most
instances* only be relevant to compile routine biographical
information for booking and arraignment purposes); *see also
United States v. Kelly*, No. 06-CR-6077L, 2007 U.S. Dist. LEXIS
62602, at *2-3 (W.D.N.Y. Aug. 24, 2007) (holding that questions
to defendant concerning his name and his companion's name fell
under the pedigree exception because marshals were trying to
determine identity of defendant).

It would not be reasonable for an officer in Zeller's
position to anticipate that Mr. Hill would respond to a question
about previous arrests with a statement that could be used in a
criminal trial.  An acknowledgment by a suspect that he had been
arrested on a previous charge would likely be irrelevant to
establishing the elements of a crime against the suspect in a
subsequent criminal case based on a different charge.  *See
McCray*, 396 F.3d at 222-223 (noting that officer who asked
defendant about her actual hair color could only reasonably

29

expect to receive a one-word response relevant to the booking and identification process but not an incriminatory statement); *Velazquez v. Lape*, 622 F. Supp. 2d 23, 32-34 (S.D.N.Y. 2008) (permissible under pedigree exception for officer to ask defendant where he lived and then obtain a search warrant for that address, because it was "a reasonable inference" that the officer "did not anticipate using [defendant's] answer at a trial"); *cf. United States v. Toribio-Toribio*, No. 09-CR-161, 2009 U.S. Dist. LEXIS 68699, at *6-7 (N.D.N.Y. Aug. 6, 2009) (holding that pedigree questions to defendant about his place of birth required *Miranda* warning because officer knew defendant was falsely representing his citizenship and that "questions pertaining to [defendant's] place of birth go . . . to the heart of the crime itself . . . [and] were likely to elicit an incriminating response").  Zeller reasonably expected his question to prompt a statement that could be used to determine the defendant's identity, rather than a statement that could be used against the defendant in a trial.  Therefore, Zeller's question did not amount to an unconstitutional interrogation even though it produced an answer that assisted in the investigation of the Cuenca homicide.[4]

---

[4] Notably, the government has stated that it is not seeking to use Mr. Hill's response to the question about whether he had been arrested at trial.  (Gov. Let. at 4 n.3.)  Finally, to the extent that Mr. Hill seeks to suppress his identity, such suppression is not permissible under the Exclusionary Rule. *Adegbite*, 846 F.2d at 838-39 (holding that "the identity of defendants is not

### iii.  Placement in Lineup

The third issue before the court is whether Mr. Hill's rights under the Fourth Amendment were violated because he was placed in a lineup on August 25, 1997, even though he had been arrested and was in custody on an unrelated charge.  Mr. Hill also argues that the government did not have probable cause to compel him to appear in the lineup for the Cuenca homicide. (Def. Let. at 13.)

As noted, even though the Second Circuit has not directly ruled on whether a lawfully detained defendant can be compelled to appear in a lineup for an unrelated matter, other circuits that have considered the issue have held that such compulsion is permissible.  *Rigney*, 355 F.2d at 714-15; *see also Anderson*, 490 F.2d at 788-89; *Anderson*, 406 F.2d at 720.  Two district courts in the Second Circuit have also held that a lawfully detained individual can be compelled to participate in a lineup for an unrelated charge. *Collins*, 878 F. Supp. at 456; *Aziz*, 1991 WL 278907 at *6.[5]

suppressible under the exclusionary rule") (internal quotation and citation omitted).

[5] Mr. Hill's argument that the lineup should be suppressed because the parole warrant was in the name Jack Henry and did not contain a photograph of Mr. Hill is also without merit.  (Def. Let. at 13.)  Zeller obtained biographical information about Mr. Hill from Officer Riddle, (11/6/2 Tr. at 153-54), and the parole warrant also contained Mr. Hill's biographical information and listed the names "Jack Henry" and "Alvin Hill," (11/13/12 Tr. at 98).  It is therefore clear that the warrant authorized the arrest of the individual who used the names Jack Henry a/k/a Alvin Hill, or the individual determined to be Mr. Hill.

Thus, this court also finds that there was no Fourth Amendment violation in compelling Mr. Hill to appear in a lineup related to the Cuenca homicide on August 25, 1997, because he was already in lawful custody that day on a parole violation.

Although the court holds that police could compel Mr. Hill to appear in a lineup for an unrelated charge when he was already in lawful custody, this court also finds that the government independently had probable cause to compel Mr. Hill to appear in the August 25, 1997 lineup. By that date, the government had probable cause based on (i) detailed information and photographs received from the CI, and (ii) information provided by other witnesses and through additional investigation that corroborated certain of the CI's statements. *See, e.g.*, *Wagner*, 989 F.2d at 73 (stating that "if an informant's declaration is corroborated in material respects, the entire account may be credited, including parts without corroboration").

First, the CI's physical description of Mr. Hill shortly after the shooting matched the physical descriptions of the suspect provided by four other witnesses, (11/6/12 Tr. at 149), and an anonymous caller who also identified Mr. Hill as being responsible for the August 9, 1997 shooting, (Gov. Ex. 3500-MZ-17). Second, Zeller could identify Mr. Hill as the figure in the photographs taken by the CI when he encountered him.

(11/6/12 Tr. at 138-39.)  Finally, the CI's description of Mr.

Hill as a young man who used the name "Elvin," (11/13/12 Tr. at

83-84), and was out on parole, (*id.* at 105), matched the

information that Zeller obtained after detaining Mr. Hill,

questioning him, and showing his photograph to Officer Riddle,

(*id.* at 94-95, 98).

### iv.   Lineup Procedures

Finally, Mr. Hill argues that the lineup was unduly

suggestive because (i) Givens could not definitively state that

she had not seen any of the subjects in the lineup before

viewing the lineup, (ii) Givens testified that she saw the

subjects of the lineup walk into the room and sit down, (iii)

Givens was not given instructions tailored to reduce

suggestiveness and mistaken identification, (iv) the lineup was

simultaneous instead of sequential, (v) there were disparities

in the physical appearances between Mr. Hill and three of the

fillers in the lineup, and (vi) there were discrepancies between

Zeller's testimony and Givens's testimony concerning the lineup.

(Def. Let. at 15-17.)

The record does not support Mr. Hill's claims of

suggestiveness, however, because there is no indication that

Givens was exposed to any unduly suggestive practices at the

lineup.  Mr. Hill argues that Givens may have seen some of the

subjects before viewing the lineup because she "was unable to

conclusively state that she had not viewed any of the subjects prior to viewing the lineup." (Def. Let. at 15.) Yet Givens testified that she did not remember seeing any of the fillers, (11/6/12 Tr. at 90), and that none of them looked familiar to her, (*id.* at 128). Second, the fact that Givens may have seen the subjects walk into the lineup room also does not demonstrate that she may have been exposed to any suggestive behavior, because Givens did not mention any suggestive behavior that led her to select Mr. Hill. (*Id.* at 125-26.) Third, Givens testified that she understood her instructions to mean that she should indicate if she recognized a suspect from the day of the Cuenca homicide, but she did not have the understanding that one of the men she had seen leaving the cab on the day of the shooting would necessarily be in the lineup. (*Id.* at 91-92, 119-20.) Fourth, there is no indication in the record that Givens was influenced by the fact that the lineup was simultaneous instead of sequential. Thus, none of the procedures used in the lineup were "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Jakobetz*, 955 F.2d at 803 (quoting *Denno*, 388 U.S. at 302).

In addition, to the extent there are any other discrepancies in the accounts of the lineup provided by Zeller and Givens, such as the fact that Givens testified that she told

the officers that she was 70% sure of her identification, (11/6/12 Tr. at 130), while Zeller did not recollect Givens providing such an estimate and did not memorialize it, (*id.* at 157-59), such discrepancies are generally minor, go the weight and not the admissibility of the testimony, and do not in any event show that Givens was exposed to unduly suggestive practices on the day of the lineup sufficient to warrant suppression.

Finally, although several of the fillers in the lineup were of different heights and builds than Mr. Hill, (7/26/12 Tr. at 13), they were not so different that "the appearance of the accused, *matching descriptions given by the witness*, so stood out from all of the others . . . as to suggest to an identifying witness that [that person] was more likely to be the culprit." *Wong*, 40 F.3d at 1359-1360 (emphasis and alterations in original) (internal quotation and citation omitted). All five of the fillers were within five years of Mr. Hill's age, several inches of Mr. Hill's height, and 50 pounds of Mr. Hill's weight. (7/26/12 Tr. at 13.) A review of the photographs and the description of the lineup subjects shows no significant disparities in appearance between Mr. Hill and the other subjects. (Gov. Ex. 3500-MZ-3.) Thus, there is no indication that Mr. Hill was the only participant in the lineup who "w[ore] distinctive clothing or otherwise match[ed] important elements

of the description provided by the victim." *Abdur Raheem*, 257 F.3d at 134; *see also United States ex rel. Pella v. Reid*, 527 F.2d 380, 384 (2d Cir. 1975) (finding lineup procedure not unduly suggestive where relatively short defendant was placed in lineup with taller fillers).

**CONCLUSION**

For the foregoing reasons, defendant's motion to suppress the in-person lineup identification of the defendant on August 25, 1997, and to preclude an eyewitness identification of the defendant in court is denied.


**SO ORDERED.**


Dated: June 26, 2013
       Brooklyn, New York


_____  /s/_____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York